# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In Re: | ) | Chapter 11 |
|  | ) |  |
| **INSIGHT HEALTH SERVICES HOLDINGS CORP., et al,**[1] | ) | **Case No. 10-16564 (AJG)** |
|  | ) | **Judge Arthur J. Gonzalez** |
|  | ) |  |
| Debtors. | ) | **Jointly Administered** |
|  | ) |  |

## FINAL ORDER (1) AUTHORIZING DEBTORS-IN-POSSESSION TO OBTAIN FINANCING, GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (2) MODIFYING AUTOMATIC STAY; AND (3) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361 AND 363(c)(2)

This matter is before the Court on the Motion (the "*Motion*") of **InSight Health Services Holdings Corp.**, an entity organized under the laws of the State of Delaware ("*Parent*"), **InSight Health Services Corp.**, an entity organized under the laws of the State of Delaware ("*InSight Health Services*"), **InSight Health Corp.**, an entity organized under the laws of the State of Delaware ("*IHC*"), **Maxum Health Services Corp.**, an entity organized under the laws of the State of Delaware ("*Maxum*"), **Open MRI, Inc.**, an entity organized under the laws of the State of Delaware ("*Open MRI*"), **Signal Medical Services, Inc.**, an entity organized under the laws of the State of Delaware ("*Signal Medical*"), **Comprehensive Medical Imaging, Inc.**, an entity organized under the laws of the State of Delaware ("*Comprehensive Medical*"), **Comprehensive**

---

[1] Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: InSight Health Services Holdings Corp. (0028); InSight Health Services Corp. (2770); Comprehensive Medical Imaging Centers, Inc. (6946); Comprehensive Medical Imaging, Inc. (2473); InSight Health Corp. (8857); Maxum Health Services Corp. (5957); North Carolina Mobile Imaging I LLC (9930); North Carolina Mobile Imaging II LLC (0165); North Carolina Mobile Imaging III LLC (0251); North Carolina Mobile Imaging IV LLC (0342); North Carolina Mobile Imaging V LLC (0431); North Carolina Mobile Imaging VI LLC (0532); North Carolina Mobile Imaging VII LLC (0607); Open MRI, Inc. (1529); Orange County Regional PET Center - Irvine, LLC (0190); Parkway Imaging Center, LLC (2858); and Signal Medical Services, Inc. (2413). The location of the Debtors' corporate headquarters and the Debtors' service address is: 26250 Enterprise Court, Suite 100, Lake Forest, California 92630.

**Medical Imaging Centers, Inc.**, an entity organized under the laws of the State of Delaware ("*Comprehensive*"), **Orange County Regional PET Center - Irvine, LLC**, an entity organized under the laws of the State of California ("*Orange County*"), and **Parkway Imaging Center, LLC**, an entity organized under the laws of the State of Nevada ("*Parkway*"; Parent, InSight Health Services, IHC, Maxum, Open MRI, Signal Medical, Comprehensive Medical, Comprehensive, Orange County, and Parkway are collectively referred to herein as "*Borrowing Debtors*" and individually as a "*Borrowing Debtor*"), as debtors and debtors-in-possession in the above-captioned Chapter 11 cases, requesting entry of an order (1) authorizing Borrowing Debtors to obtain financing and other extensions of credit from **Bank of America, N.A.**, a national banking association ("*BofA*", and in its capacity as post-petition lender, "*DIP Lender*"), grant security interests and liens and accord superpriority claim status in favor of DIP Lender pursuant to Sections 361, 364(c) and 364(d)(1) of Title 11 of the United States Code (the "*Bankruptcy Code*"); (2) modifying the automatic stay; and (3) authorizing Borrowing Debtors' use of cash collateral.[2]

Based upon the Court's review of the Motion and all matters brought to the Court's attention at the interim hearing, which was held on December 14, 2010 (the "*Interim Hearing*"), and at the final hearing, which was held on January 4, 2011 (the "*Final Hearing*"; the Interim Hearing and the Final Hearing are collectively referred to herein as the "*Hearings*"), in each case pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), and after due deliberation and consideration, the Court makes the following findings of fact and conclusions of law applicable

---

[2] Capitalized terms used herein but not defined in this Order shall have the meanings ascribed to them in the Post-Petition Loan and Security Agreement entered into by Borrowing Debtors and DIP Lender in substantially the form attached to the Motion.

K&E 18186495

to the financing sought by Borrowing Debtors from DIP Lender (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*):

THE COURT HEREBY FINDS AND DETERMINES:

A.     Petition Date.  On December 10, 2010 (the "*Petition Date*"), each Debtor filed with the Court its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code and is continuing to manage its properties and to operate its business as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed herein.  The Court has entered an order authorizing joint administration of these Chapter 11 cases.

B.     Nature of Business. Debtors are in the business of providing diagnostic imaging services through a network of fixed-site centers and mobile facilities.  Debtors' services are noninvasive procedures that generate representations of internal anatomy on film or digital media, which are used by physicians for the diagnosis and assessment of diseases and disorders.

C.     Pre-Petition Loan Agreement; Pre-Petition Revolver Debt.  IHC, Maxum, Open MRI, Signal Medical, Comprehensive Medical, Comprehensive, Orange County and Parkway (collectively, "*Pre-Petition Borrowers*") are parties with BofA, in its capacities as a lender (in such capacity, "*Pre-Petition Lender*") and as agent for Pre-Petition Lender (in such capacity, the "*Pre-Petition Agent*"; together with Pre-Petition Lender, "*Pre-Petition Credit Parties*"), to that certain Second Amended and Restated Loan and Security Agreement dated August 1, 2007 (hereinafter, together with all amendments thereto and modifications thereof, the "*Pre-Petition Loan Agreement*").  As of the Petition Date, Pre-Petition Borrowers were jointly and severally liable to Pre-Petition Lender pursuant to the Pre-Petition Loan Agreement for (i) any amount that may be drawn under certain standby letters of credit for the account of one or more Obligors (as

such term is defined in the Pre-Petition Loan Agreement) and for the benefit of (a) United States Fire Insurance in the face amount of $875,000, (b) Gelco Corporation in the face amount of $275,000 (c) Key Equipment Finance Inc. in the face amount of $275,000, (d) Gelco Corporation in the face amount of $185,000, and (e) the account of Southern California Edison Company in the face amount of $42,825 (collectively, the "*Pre-Petition LCs*"), (ii) certain accrued fees and expenses, and (iii) certain Banking Relationship Debt (as defined in the Pre-Petition Loan Agreement) (collectively, the "*Pre-Petition Revolver Debt*"). Each of Parent and InSight Health Services, as guarantors (collectively, in such capacities, "*Guarantors*"), has guaranteed the payment of all Obligations under (and as defined in) the Pre-Petition Loan Agreement.

D.     Pre-Petition Secured Notes.     InSight Health Services, as issuer, and certain Borrowing Debtors, as guarantors (collectively, the "*Pre-Petition Issuers*"), are parties with U.S. Bank National Association, in its capacity as trustee (in such capacity, the "*Indenture Trustee*") to that certain Indenture dated as of September 22, 2005 (hereinafter, together with all amendments thereto and modifications thereof, the "*Pre-Petition Indenture*"), pursuant to which Insight Health Services issued certain senior secured floating rate notes due 2011 (the "*Notes*") to certain holders thereof (collectively, the "*Pre-Petition Note Holders*"). As of the Petition Date, the Pre-Petition Issuers were liable to Pre-Petition Note Holders on account of the Notes in the aggregate amount of $293,500,000.00, plus interest and fees due and owing (the "*Pre-Petition Note Debt*").

E.     Pre-Petition Revolver Liens.     Pursuant to the Pre-Petition Loan Agreement and related documents (collectively, the "*Pre-Petition Loan Documents*"), Pre-Petition Borrowers and Guarantors each granted and collaterally assigned to Pre-Petition Agent, for the benefit of Pre-Petition Credit Parties and as security for the payment of all Obligations under (and as

-4-

defined in) the Pre-Petition Loan Agreement, including, without limitation, all Pre-Petition Revolver Debt, security interests in and liens upon (collectively, the "*Pre-Petition Revolver Liens*") all of the following property of each Pre-Petition Borrower and each Guarantor: all accounts; all instruments, chattel paper (including, without limitation, electronic chattel paper), documents, letter-of-credit rights and supporting obligations, in each case to the extent arising out of, relating to, or given in exchange or settlement for or to evidence the obligation to pay any account; all general intangibles that arise out of or are related to any account or from which any account arises; certain deposit accounts; all monies in the possession or under the control of Pre-Petition Agent, including, without limitation, any cash collateral in any cash collateral deposit account; all products and cash and non-cash proceeds of the foregoing, including, without limitation, proceeds of insurance in respect of any of the foregoing; and all books and records (including, without limitation, customer lists, files, correspondence, tapes, computer programs, print-outs and other computer materials and records) of such Pre-Petition Borrower pertaining to any of the foregoing (all such property, as the same existed on the Petition Date, being hereinafter referred to as the "*Pre-Petition Revolver Collateral*"). Borrowing Debtors acknowledged in the Motion and at the Hearings that, as of the Petition Date, the value of the Pre-Petition Revolver Collateral exceeds the aggregate of the Pre-Petition Revolver Debt.

F.    <u>Pre-Petition Noteholder Liens</u>.  Pursuant to the Pre-Petition Indenture, that certain Security Agreement and that certain Pledge Agreement, each dated as of September 22, 2005 (each as amended from time to time, and collectively, the "*Note Security Agreement*"), between the Pre-Petition Issuers and U.S. Bank National Association, as collateral agent (in such capacity, the "*Collateral Agent*"), and all related documents (collectively, the "*Pre-Petition Note Documents*"), each Pre-Petition Issuer granted and collaterally assigned to Indenture Trustee, for

the benefit of Pre-Petition Note Holders and as security for the payment of all Pre-Petition Note Debt, security interests in and liens upon (collectively, the "*Pre-Petition Noteholder Liens*"), other than the collateral expressly excluded under Section 2.01 of the Note Security Agreement, all of such Pre-Petition Issuer's inventory, general intangibles, intellectual property, documents and all supporting obligations of any kind given by any person with respect thereto, chattel paper, equipment, investment property and all supporting obligations of any kind given by any person with respect thereto, deposit accounts (other than deposit accounts that are included as Pre-Petition Revolver Collateral), collateral accounts, securities accounts, books and records, stock, instruments, partnership interests, limited liability company interests, investment property, financial assets, and proceeds of all of the foregoing (all such property, as the same existed on the Petition Date, being hereinafter referred to as the "*Pre-Petition Noteholder Collateral*," and together with the Pre-Petition Revolver Collateral, the "*Pre-Petition Collateral*"). Prior to the Petition Date, an ad hoc group of Pre-Petition Note Holders[3] holding more than 50% of the outstanding amount of the Pre-Petition Note Debt entered into a restructuring support agreement pursuant to which, among other things, they agreed to (i) support the DIP Facility and the use of cash collateral and other terms set forth in the Interim Financing Order (as defined below) and this Order (collectively, the "*Orders*") and (ii) through the Orders, direct the Indenture Trustee and the Collateral Agent to take all actions necessary to effectuate and implement the terms of the Orders.

G.     <u>Equipment Lien Creditors</u>.     Borrowing Debtors have granted certain liens in specific equipment in the possession of one or more Borrowing Debtors on the Petition Date (collectively, the "*Equipment Collateral*") to certain entities other than the Indenture Trustee

---

[3] The "ad hoc group of Pre-Petition Note Holders" as such term is used in this Order means that certain group of Pre-Petition Note Holders represented by Skadden, Arps, Slate, Meagher & Flom LLP as legal counsel.

K&E 18186495

(collectively, the "*Equipment Lien Creditors*").  Borrowing Debtors are not aware of any security interests or liens asserted against any of the Pre-Petition Collateral other than by Pre-Petition Credit Parties, Indenture Trustee, and the Equipment Lien Creditors.

        H.      <u>Borrowing Debtors' Stipulations</u>.  Borrowing Debtors have stipulated (in the Motion and at the Hearings) that (a) the Pre-Petition Loan Documents and Pre-Petition Note Documents constitute valid and binding agreements and obligations of each Borrowing Debtor party thereto; (b) the Pre-Petition Revolver Liens and the Pre-Petition Noteholder Liens (i) constitute valid, binding, enforceable and perfected security interests and liens, are not subject to avoidance or subordination, and, in the case of the Pre-Petition Revolver Liens, are subject only to certain security interests and other liens that are expressly permitted under the Pre-Petition Loan Documents to have priority over the Pre-Petition Revolver Liens, and, in the case of the Pre-Petition Noteholder Liens, are subject only to certain security interests and other liens that are expressly permitted under the Pre-Petition Note Documents to have priority over the Pre-Petition Noteholder Liens, but in each case only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code); (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and are senior in priority to the Pre-Petition Revolver Liens or Pre-Petition Noteholder Liens (as applicable) under applicable law after giving effect to any applicable subordination or intercreditor agreements; and (iii) are not subject to avoidance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Pre-Petition Revolver Debt and Pre-Petition Note Debt constitute legal, valid and binding obligations of each Borrowing Debtor and

are not subject to equitable subordination, offset, recoupment or recharacterization; (d) all amounts paid on or before the Petition Date by any Borrowing Debtor to Pre-Petition Credit Parties on account of the Pre-Petition Revolver Debt or to Pre-Petition Note Holders on account of the Pre-Petition Note Debt are not subject to any objection, offset, defense or counterclaim of any kind or nature or reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) no claims in favor of any Borrowing Debtor exist against any Pre-Petition Credit Parties or Pre-Petition Note Holders under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to Section 105 or Chapter 5 (including, without limitation, Sections 510, 544, 547, 548, 549, 550 or 553) of the Bankruptcy Code.

I.    Need for Financing and Cash Collateral Use.  An immediate and ongoing need exists for Borrowing Debtors to obtain financing and use of cash collateral to continue the operation of their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code and to minimize disruption of such businesses.  Despite diligent efforts, Borrowing Debtors have been unable to obtain financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense or solely in exchange for the grant of a special administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code; and Borrowing Debtors are unable to obtain financing in the form of credit secured by liens solely on unencumbered assets of Borrowing Debtors or solely by liens that are junior to existing liens on property of the estate pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code on terms as favorable as those offered by DIP Lender pursuant to the DIP Loan Agreement (as defined below).

K&E 18186495

J.     Proposed DIP Facility.  Borrowing Debtors requested DIP Lender to establish a secured revolving credit facility in their favor (the "*DIP Facility*") pursuant to which Borrowing Debtors could from time to time obtain loans ("*DIP Loans*") and letters of credit ("*Letters of Credit*") in an aggregate principal amount up to $15,000,000 outstanding at any time (with a sublimit of $5,000,000 for Letters of Credit), secured by the DIP Collateral (as defined below). DIP Lender established the DIP Facility, upon the terms and conditions set forth in the Interim Financing Order and in a certain Post-Petition Loan and Security Agreement dated on or about December 14, 2010, by and among Borrowing Debtors and DIP Lender (together with all schedules, exhibits and annexes thereto, and as at any time amended, modified, supplemented or restated in accordance with this Order, the "*DIP Loan Agreement*").

K.     Certain Conditions to DIP Facility.  DIP Lender's willingness to continue to maintain the DIP Facility is conditioned upon, among other things, (i) Borrowing Debtors' obtaining Court approval of ongoing extensions of credit under the DIP Loan Agreement; (ii) this Court confirming Borrowing Debtors' provision of adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for the interests of Pre-Petition Credit Parties in the Pre-Petition Revolver Collateral of each Borrowing Debtor; (iii) this Court confirming Borrowing Debtors' grant of, as security for the payment of the DIP Obligations (as defined below), security interests in and liens upon the DIP Collateral (as defined below); and (iv) Borrowing Debtors' ongoing satisfaction of all conditions precedent in the DIP Loan Agreement, unless waived in writing by DIP Lender in its sole discretion.

L.     Hearings; Budget.  Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), Borrowing Debtors requested in the Motion that the Court hold the Interim Hearing to consider authorizing Borrowing Debtors, during the Interim Period (as defined in the Interim Financing

Order), to use cash collateral and to obtain DIP Loans, Letters of Credit and other credit extensions pursuant to the DIP Loan Agreement (such DIP Loans, Letters of Credit and other credit extensions being collectively called the "*Credit Extensions*") for purposes specified in the DIP Loan Agreement and the budget referred to in the DIP Loan Agreement (the "*Budget*"), and that the Court hold the Final Hearing to consider entry of an order authorizing Borrowing Debtors to continue to obtain Credit Extensions after the Interim Period for purposes authorized by the DIP Loan Agreement, all as approved by Order of this Court dated and entered on December 14, 2010 (the "*Interim Financing Order*").

M. <u>Service of Motion</u>. Borrowing Debtors have certified that copies of the Motion (together with copies of the DIP Loan Agreement and the Budget) and notice of the Final Hearing were served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"), counsel for Pre-Petition Agent, counsel for the Indenture Trustee, counsel for the ad hoc group of Pre-Petition Note Holders, the holders of the fifty (50) largest general unsecured claims against Borrowing Debtors, all persons or entities (other than Pre-Petition Credit Parties and Pre-Petition Note Holders) known by Borrowing Debtors to have or assert any security interest in or lien upon any of the Pre-Petition Collateral, including, without limitation, the Equipment Lien Creditors, and all parties (if any) that have filed requests for notices under Rule 2002 of the Bankruptcy Rules and that notice of the Final Hearing on the Motion was served in accordance with the terms of the Interim Financing Order. The Court finds that notice of the Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c).

K&E 18186495

N.    <u>Finding of Cause</u>.  Good cause has been shown for the entry of this Order and authorization for Borrowing Debtors to continue to obtain the Credit Extensions pursuant to the DIP Loan Agreement.  Borrowing Debtors' need for financing of the type afforded by the DIP Loan Agreement continues to be ongoing, immediate and critical.  Entry of this Order will minimize disruption of Borrowing Debtors' businesses and operations, will preserve the assets of Borrowing Debtors' estates and their value and is in the best interests of Borrowing Debtors, their creditors and their respective estates.  The terms of the proposed financing appear fair and reasonable, reflect Borrowing Debtors' exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

O.    <u>Finding of Good Faith</u>.  Based upon the record presented at the Hearings, the Court finds that the DIP Loan Agreement and the other DIP Loan Documents (as defined below), as well as the terms of the Orders, have been negotiated in good faith and at arm's length between Borrowing Debtors, on the one hand, and DIP Lender, on the other.  Therefore, all Credit Extensions heretofore and hereafter made to Borrowing Debtors pursuant to the DIP Loan Documents shall be deemed to have been made in good faith within the meaning of Section 364(e) of the Bankruptcy Code.

P.    <u>Jurisdiction; Core Proceeding</u>.  This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  The venue of these Chapter 11 cases in this district is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, as follows:

K&E 18186495

1.     **Authorization of Ongoing Financing.**  The Motion is hereby GRANTED with respect to ongoing Credit Extensions after the Interim Period, subject to the terms and conditions set forth herein.  Any and all objections to the relief requested in the Motion, to the extent not withdrawn with prejudice, waived or resolved by consent at or before the Final Hearing, are hereby OVERRULED and DENIED.

2.     **Authorization of Financing; Budget.**  Subject to the terms and conditions set forth herein, the Court hereby ratifies, reauthorizes and reapproves (i) the execution and delivery by each Borrowing Debtor of the DIP Loan Agreement in substantially the form annexed to the Motion (with such changes as were addressed to the Court at the Hearings or are authorized to be made as amendments to the DIP Loan Agreement in accordance with this Order) and all other instruments, security agreements, assignments, pledges, and other documents referred to therein or required by the DIP Loan Agreement to be executed by one or more Borrowing Debtors (the DIP Loan Agreement and such other instruments, security agreements, assignments, pledges and other documents, as at any time amended, being collectively called the "*DIP Loan Documents*"); (ii) Borrowing Debtors' continuing to obtain DIP Loans, Letters of Credit and other Credit Extensions in accordance with the DIP Loan Agreement from time to time up to an aggregate principal amount outstanding at any time of $15,000,000, plus additional amounts (if any) that DIP Lender, in its sole discretion, elects to advance as DIP Loans to fund all or part of the Carve-Out (as defined below) to the extent set forth in paragraph 10 of this Order, plus interest, fees and other charges payable in connection with the foregoing; and (iii) Borrowing Debtors' satisfying or continuing to satisfy all conditions precedent and performing all obligations hereunder and under the DIP Loan Documents in accordance with the terms hereof and thereof; provided, however, that the authorization to use proceeds of DIP Loans shall be

-12-

limited solely to the purposes specified and authorized in this Order or the DIP Loan Documents (collectively, the "*Permitted Uses*"), including, without limitation, the permitted uses of proceeds set forth in Section 2.1.3 of the DIP Loan Agreement.  In no event shall any proceeds of DIP Loans be transferred to or used by any Debtor that is not a Borrowing Debtor.  DIP Lender shall not have any obligation or responsibility to monitor Borrowing Debtors' use of any DIP Loans and may rely upon any Borrowing Debtor's representations that the amount of the Credit Extensions requested at any time, and the use thereof, are in accordance with the requirements of this Order, the DIP Loan Documents and Bankruptcy Rule 4001(c)(2).  Borrowing Debtors' use of proceeds of the DIP Loans authorized under the Orders shall not impair, release or alter the liability of any Guarantor with respect to the Pre-Petition Revolver Debt.  As provided in the DIP Loan Agreement, and to induce DIP Lender to enter into the DIP Loan Agreement and the other DIP Loan Documents, (i) the Pre-Petition LCs shall continue to be treated as Letters of Credit issued under the DIP Loan Agreement, shall continue to constitute part of the Credit Extensions thereunder, shall continue to be entitled to all of the benefits and security of the DIP Loan Documents and the Orders, and shall not be regarded as part of the Pre-Petition Revolver Debt, and the portion of any fees relating to any Pre-Petition LCs that accrued during the period from the Petition Date to the date of the entry of the Interim Financing Order, as well as all fees that accrue after the date of this Order, shall continue to be deemed to be part of the fees payable under the DIP Loan Agreement for Letters of Credit and shall continue to be paid in accordance with the terms thereof; and (ii) the Banking Relationship Debt of each Borrowing Debtor to BofA and any of BofA's affiliates, whether incurred or arising prior to or after the Petition Date, shall continue to constitute DIP Obligations owed to DIP Lender, shall continue to be entitled to all of the benefits and security of the DIP Loan Documents and the Orders, and from and after

entry of the Interim Financing Order shall not be regarded as part of the Pre-Petition Revolver Debt. Borrowing Debtors shall continue to deliver to the DIP Lender, on a monthly basis after the closing of the DIP Facility, the Budget as and to the extent required by the DIP Loan Agreement, with Borrowing Debtors' continuing adherence to the total receipts and disbursements line items in the Budget to be within a 15% variance for each of the Applicable Budget Periods (as defined below). As used herein, the term *"Applicable Budget Period"* means as follows: (a) for the period commencing on the date of closing of the DIP Facility and ending on the first Friday after such date, the one-week period ending on such Friday; (b) for the period commencing on the date of closing of the DIP Facility and ending on the second Friday after such date, the two-week period ending on such Friday; (c) for the period commencing on the date of closing of the DIP Facility and ending on the third Friday after such date, the three-week period ending on such Friday; and (d) for the period commencing on the date of closing of the DIP Facility and ending on the fourth Friday after such date and each Friday thereafter, the four-week period ending on such Friday. Borrowing Debtors shall continue to provide the Budget to counsel for the ad hoc group of Pre-Petition Note Holders on a monthly basis and business operational expenses shall be materially consistent therewith. Any amendments or supplements to the Budget made by Borrowing Debtors must be acceptable to DIP Lender in its discretion and reasonably acceptable to the ad hoc group of Pre-Petition Note Holders.

3. **Execution, Delivery and Performance of DIP Loan Documents.** The DIP Loan Documents heretofore or hereafter executed by each Borrowing Debtor shall constitute valid and binding obligations of each Borrowing Debtor, enforceable against such Borrowing Debtor in accordance with their terms. In furtherance of the provisions of paragraph 2 of this Order, each Borrowing Debtor is authorized and directed to do and perform all acts; to make,

K&E 18186495

execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, pledge agreements, mortgages, deeds of trust, deeds to secure debt, financing statements and intellectual property filings); and to pay all filing and recording fees as may be necessary or, in the opinion of DIP Lender, desirable to give effect to any of the terms and conditions of the DIP Loan Documents or as otherwise required or contemplated by the DIP Loan Documents.

4. **DIP Collateral and DIP Liens.**

a. All Obligations under (and as defined in) the DIP Loan Agreement, including, without limitation, all Credit Extensions and Banking Relationship Debt (all of the foregoing being collectively called the "*DIP Obligations*") are and shall continue to be secured by security interests and liens (collectively, the "*DIP Liens*") in favor of DIP Lender with respect to all of the Collateral (as defined in the DIP Loan Agreement), which consists only of (i) all of the property of each Borrowing Debtor that is Pre-Petition Revolver Collateral or is post-petition property of the same type as the Pre-Petition Revolver Collateral, (ii) all of each Borrowing Debtor's share of monies derived from the business of any joint venture, and (iii) any equipment, machinery or other item of property that is purchased by Borrowing Debtors with DIP Loans or Cash Collateral (as defined below), in each case whether any of such property is now in existence or is hereafter created, acquired or arising and wherever located (all such property, including, without limitation, all Pre-Petition Revolver Collateral of each Borrowing Debtor and the proceeds thereof, being collectively hereinafter referred to as the "*DIP Collateral*"). In no event shall any DIP Liens be granted to DIP Lender with respect to any property of a Borrowing Debtor that constitutes either Pre-Petition Noteholder Collateral, whether now in existence or hereafter created or acquired, or Equipment Collateral.

K&E 18186495

b.     The DIP Liens with respect to the DIP Collateral shall have the following priorities:

i.     <u>Unencumbered Collateral</u>.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, perfected first priority senior security interests in and liens upon (x) all DIP Collateral that, as of the Petition Date, is not subject to valid, perfected and unavoidable liens or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code, and (y) all DIP Collateral that is created, acquired or arises after the Petition Date (other than direct proceeds of Pre-Petition Collateral that is subject to valid, perfected and unavoidable liens in existence on the Petition Date);

ii.     <u>Encumbered Collateral</u>.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, perfected junior security interests in and liens upon all DIP Collateral that was subject to valid, perfected and unavoidable liens on the Petition Date (other than the Pre-Petition Revolver Liens) or to valid and unavoidable liens in existence on the Petition Date that are perfected thereafter (with a priority that relates back to a date prior to the Petition Date), as permitted by Section 546(b) of the Bankruptcy Code; and

iii.     <u>Extent of Priming DIP Lien</u>.  Pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior in priority to the Pre-Petition Revolver Liens and the Pre-Petition Revolver Replacement Liens (as hereinafter defined); and

iv.     <u>Carve-Out</u>.  The DIP Liens shall be subordinate in all respects to the Carve-Out in accordance with paragraph 10 of this Order.

The DIP Liens shall not be subject or subordinate to any security interest or other lien that is avoided and preserved for the benefit of Borrowing Debtors and their estates under Section 551 of the Bankruptcy Code.

c.     Avoidance Claims and Proceeds.     Notwithstanding the foregoing provisions of this paragraph 4 or anything to the contrary in the DIP Loan Documents, the DIP Liens shall not attach to any of the following property (unless any Borrowing Debtor shall grant or consent to any lien or security interest therein in favor of any other party, in which event all such property shall be subject to the DIP Liens): (x) any claims pursuant to Sections 502(d), 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code (the "*Avoidance Claims*") or (y) any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims (the "*Avoidance Proceeds*").

5.     **Superpriority Claim; Surcharge**.

a.     Scope of Superpriority Claim.     Subject to the Carve-Out in all respects, all DIP Obligations shall constitute an allowed administrative expense claim under Section 503(b) of the Bankruptcy Code and shall constitute an allowed superpriority claim (the "*Superpriority Claim*") pursuant to Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses in Borrowing Debtors' cases of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(e), 507(a), 507(b), 546(c), 726 or 1114 of the Bankruptcy Code, provided that the Superpriority Claim shall not be paid from Avoidance Proceeds. Without limiting the generality of the foregoing, the Superpriority Claim shall be superior to any and all administrative priority claims arising out of transactions, if any, arising between any Borrowing Debtor, on the one hand, and any other Borrowing Debtor or any affiliate of any Borrowing Debtor (collectively, the "*Intercompany Affiliate Transaction*

*Claims*"), and all Intercompany Affiliate Transaction Claims shall be subordinate to the Superpriority Claim.

b. <u>No Surcharge</u>. No costs or administrative expenses that have been or may be incurred in these Chapter 11 cases, in any matters or proceedings related hereto or in any superseding Chapter 7 case, and no priority claims are or will be prior to or on a parity with the Superpriority Claim of DIP Lender for the DIP Obligations. In no event shall any costs or expenses of administration be imposed upon DIP Lender or any of the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of DIP Lender, and no such consent shall be implied from any action, inaction or acquiescence by DIP Lender; and in no event shall any costs or expenses of administration be imposed upon the Pre-Petition Credit Parties or any Pre-Petition Revolver Collateral, or upon the Pre-Petition Note Holders or any Pre-Petition Noteholder Collateral, whether pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Pre-Petition Credit Parties or the Pre-Petition Note Holders, as applicable, and no such consent shall be implied from any action, inaction or acquiescence by the Pre-Petition Credit Parties or the Pre-Petition Note Holders.

6. **<u>Joint and Several Liability; Borrowing Debtor Reimbursement Claims</u>**.

a. Borrowing Debtors are and shall continue to be jointly and severally liable to repay the DIP Obligations in accordance with the DIP Loan Documents. The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without offset or counterclaim. In no event shall Borrowing Debtors be authorized to offset or recoup any amounts owed, or alleged to be owed, by DIP Lender or any

Pre-Petition Credit Party to any Debtor or any of its subsidiaries or affiliates against any of the DIP Obligations unless and to the extent expressly otherwise agreed to in writing by DIP Lender.

b.     No Borrowing Debtor shall have any right of contribution, reimbursement or subrogation from any other Borrowing Debtor or any other Borrowing Debtor's assets as a result of such other Borrowing Debtor's use of Cash Collateral (as defined below) or DIP Loans except for contribution rights set forth in the DIP Loan Agreement, and any such right of contribution as set forth in DIP Loan Agreement shall be an allowed claim under Section 364(c)(1) of the Bankruptcy Code, provided that all such contribution claims (and the Section 364(c)(1) priority accorded them) shall be junior, subordinate and subject to the DIP Liens, the Pre-Petition Revolver Liens, the Pre-Petition Revolver Replacement Liens and the Superpriority Claim and may not be paid unless and until full and final payment of all Pre-Petition Revolver Debt and Full Payment (as defined in the DIP Loan Agreement) of the DIP Obligations has occurred.

7.     **Cash Collateral.**     Subject to the terms of this Order and the DIP Loan Documents, Borrowing Debtors are authorized to use cash collateral that is secured by the DIP Liens or the Pre-Petition Revolver Liens in accordance with this Order and the DIP Loan Documents.  No such cash collateral may be used by any Debtor that is not a Borrowing Debtor. Each Borrowing Debtor shall cause all proceeds of DIP Collateral that are in any Borrowing Debtor's possession on the Petition Date or that are received by any Borrowing Debtor after the Petition Date (collectively, the "*Cash Collateral*") to be promptly deposited in one or more accounts designated by DIP Lender (collectively, the "*Dominion Accounts*"), which shall be subject to the DIP Liens.  Prior to the deposit of such Cash Collateral to a Dominion Account, Borrowing Debtors shall be deemed to hold all such proceeds in trust for the benefit of DIP

K&E 18186495

Lender. DIP Lender may apply (and reapply) any or all Cash Collateral at any time or times in its possession or control to the payment of any of the DIP Obligations, in such order of application as DIP Lender may designate or elect, and may use all or part of the Cash Collateral to collateralize, in accordance with the DIP Loan Agreement, any Letters of Credit, Banking Relationship Debt or other contingent Obligations. If after Full Payment of the DIP Obligations any claims or cause or action are asserted against DIP Lender in respect of which Borrowing Debtors have provided an indemnity or hold harmless agreement, then, unless the Court determines that such claim or cause or action is not covered by such indemnity or other hold harmless agreement, DIP Lender shall be entitled to payment from Borrowing Debtors to the extent of all costs, expenses, liabilities or damages incurred by it (including, without limitation, reasonable attorneys' fees). The Debtors are not authorized to use proceeds from the sale of any Noteholder Collateral and any such proceeds shall be held by the Debtors unless and until otherwise directed by the Pre-Petition Holders or the Indenture Trustee pursuant to the terms of the Pre-Petition Indenture and all related documents; <u>provided</u>, <u>further</u>, that if a prepackaged plan of reorganization or other plan of reorganization on substantially the same terms and conditions as set forth in the Restructuring Support Agreement dated December 2, 2010 and related documents agreed to by the Debtors and the Consenting Noteholders (as defined in the Restructuring Support Agreement) is not consummated, then any proceeds from the sale of any such Noteholder Collateral shall be applied to pay down the Pre-Petition Note Debt pursuant to the terms of the Pre-Petition Indenture and all related documents.

8. **Adequate Protection of Pre-Petition Credit Parties and Pre-Petition Note Holders.** As adequate protection pursuant to Sections 361 and 363 of the Bankruptcy Code for Borrowing Debtors' use, consumption, sale, collection or other disposition of any of the Pre-

K&E 18186495

Petition Collateral of any Borrowing Debtor, the following measures of adequate protection are granted:

a. <u>Pre-Petition Revolver Replacement Liens</u>. Subject to the Carve-Out in accordance with paragraph 10 of this Order, the Court hereby ratifies, reauthorizes and reapproves the granting to and receipt by Pre-Petition Agent, for the benefit of Pre-Petition Credit Parties, of (i) replacement liens upon all of the DIP Collateral (the *"Pre-Petition Revolver Replacement Liens"*) as partial adequate protection for Pre-Petition Credit Parties to the extent of any diminution in value of the Pre-Petition Revolver Collateral caused by Borrowing Debtors' use, consumption, sale, collection or other disposition of any Pre-Petition Revolver Collateral; (ii) payment in cash, on a current basis, of all reasonable and documented out-of-pocket fees and expenses of Pre-Petition Agent (including, without limitation, the reasonable and documented out-of-pocket fees and expenses of legal counsel for Pre-Petition Agent); and (iii) superpriority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code to the extent of any inadequacy of the foregoing protections against any post-petition diminution in value of the Pre-Petition Revolver Collateral, which claims shall be subject and subordinate to the Superpriority Claim and shall not be paid from Avoidance Proceeds.

b. <u>Pre-Petition Noteholder Replacement Liens</u>. Subject to the Carve-Out in accordance with paragraph 10 of this Order, the Court hereby ratifies, reauthorizes and reapproves the granting to and receipt by Indenture Trustee, for the benefit of Pre-Petition Note Holders, of (i) replacement liens (the *"Pre-Petition Noteholder Replacement Liens"*) upon any property acquired by a Borrowing Debtor after the Petition Date that is of the same type as the Pre-Petition Noteholder Collateral (the "*Post-Petition Noteholder Collateral*"; and together with the Pre-Petition Noteholder Collateral, the "*Noteholder Collateral*") as partial adequate

K&E 18186495

protection for Pre-Petition Note Holders to the extent of any diminution in value of the Pre-Petition Noteholder Collateral caused by Borrowing Debtors' use, consumption, sale, collection or other disposition of any Pre-Petition Noteholder Collateral, which Pre-Petition Noteholder Replacement Liens shall be subject and subordinate to the Carve-Out and any DIP Liens provided to the DIP Lender in any Post-Petition Noteholder Collateral that is purchased by a Borrowing Debtor with DIP Loans; (ii) payment in cash, on a current basis, of all the reasonable professional fees and reasonable documented out-of-pocket expenses of the Indenture Trustee and the Collateral Agent; and (iii) superpriority administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code to the extent of any inadequacy of the foregoing protections against any post-petition diminution in value of the Pre-Petition Noteholder Collateral, which claims shall be subject and subordinate to the Superpriority Claim and shall not be paid from Avoidance Proceeds.

c.      Equipment Lien Creditors Replacement Liens.  As adequate protection for each Equipment Lien Creditor to the extent of any diminution in value of its Equipment Collateral caused by Borrowing Debtors' use, consumption, sale, collection or other disposition of such Equipment Collateral, the Court hereby ratifies, reauthorizes and reapproves the granting to and receipt by such Equipment Lien Creditor of replacement liens in any equipment or machinery that is of the same type as its Equipment Collateral, is acquired by a Borrowing Debtor after the Petition Date and is not subject to the DIP Liens or any liens of the Pre-Petition Note Holders.

d.      Application of Proceeds of Certain Pre-Petition Accounts.  Subject only to the extent of any outstanding balance with respect to the Pre-Petition Revolver Debt, all collections and proceeds of accounts receivable and other rights to payment of any Borrowing

-22-

Debtor, to the extent such accounts receivable or other rights to payment are in existence on the Petition Date (whether or not due or payable on the Petition Date) and constitute Pre-Petition Revolver Collateral (the "*Pre-Petition Revolver Accounts*"), shall continue to be applied to pay (or, in the case of contingent obligations, to cash collateralize) the Pre-Petition Revolver Debt, in such order of application as Pre-Petition Agent shall elect, in its discretion, until the Pre-Petition Revolver Debt is repaid (or, in the case of contingent obligations, cash collateralized) in full and thereafter applied to the DIP Obligations in such order of application as DIP Lender may elect in its discretion. Each Borrowing Debtor shall continue to use its reasonable, good faith efforts to provide promptly to Pre-Petition Credit Parties and DIP Lender reconciliations identifying the portion of each deposit to each Dominion Account that represents proceeds of Pre-Petition Revolver Accounts so as to assist Pre-Petition Credit Parties and DIP Lender in the application of the proceeds of Pre-Petition Revolver Accounts in accordance herewith.

9.     **Payment of Certain Fees and Expenses.** For so long as no Event of Default under (and as defined in) the DIP Loan Agreement shall have occurred and be continuing, Borrowing Debtors are authorized to continue to use proceeds of DIP Loans solely for Permitted Uses, including, without limitation, (a) to pay any fees required to be paid to the Clerk of the Court; (b) to pay the fees of the U.S. Trustee pursuant to 28 U.S.C. § 1930; (c) to fund fees and expenses of counsel to a Committee (as defined below) (in an aggregate amount not to exceed $50,000) in connection with an investigation by such Committee of the validity, extent, perfection and priority of the Pre-Petition Revolver Liens and Pre-Petition Noteholder Liens and the validity and amount of the Pre-Petition Revolver Debt and Pre-Petition Note Debt; and (d) to pay fees, compensation, costs, expenses and disbursements (collectively, "*Professional Expenses*") of professionals (including, without limitation, attorneys, accountants, appraisers,

K&E 18186495

consultants and investment bankers) retained by Borrowing Debtors (the "*Debtor Professionals*") or any official committee appointed in these chapter 11 cases (each such official committee being referred to as a "*Committee*," and the professionals retained by such Committee being referred to as the "*Committee Professionals*"), to the extent that payment of such Professional Expenses is in accordance with compensation procedures approved by the Court; <u>provided</u>, <u>however</u>, that no proceeds of DIP Loans or any Cash Collateral shall be used to pay Professional Expenses of any Debtor Professionals or Committee Professionals (collectively, the "*Professional Persons*") or any other costs incurred in connection with (1) commencing or continuing any claims, causes of actions or contested matters against any Pre-Petition Credit Party, Pre-Petition Note Holder or DIP Lender with respect to any loan, repayment or other transaction, act or inaction under or in connection with the Pre-Petition Loan Documents, the Pre-Petition Note Documents or DIP Loan Agreement (as the case may be), including, without limitation, discovery proceedings subsequent to the commencement of any such claims or causes of action; (2) preventing, hindering or delaying performance or enforcement by any Pre-Petition Credit Party, Pre-Petition Note Holder or DIP Lender of its rights or remedies under the Orders, any of the DIP Loan Documents, any of the Pre-Petition Loan Documents, or any of the Pre-Petition Note Documents, or any other agreement with any Borrowing Debtor; or (3) challenging any Pre-Petition Revolver Liens, Pre-Petition Noteholder Liens, the DIP Liens or the Superpriority Claim. Notwithstanding anything to the contrary contained in the Orders or the DIP Loan Documents, in no event shall the Superpriority Claim, the Pre-Petition Revolver Liens, the Pre-Petition Revolver Replacement Liens and any priority claim of Pre-Petition Credit Parties under Section 507(b) of the Bankruptcy Code or otherwise (collectively, the "*Lenders' Liens and Claims*") or the Pre-Petition Noteholder Liens, the Pre-Petition Noteholder

K&E 18186495

Replacement Liens, and any claim of Pre-Petition Note Holders under Section 507(b) of the Bankruptcy Code or otherwise (collectively, the "*Noteholders' Liens and Claims*") (i) attach to or be payable from any pre-petition retainers held by any Debtor Professional or be used as a basis to object to the payment of Professional Expenses from such pre-petition retainers or any amounts paid to any Professional Person pursuant to and in compliance with any order of the Court (including, without limitation, any order establishing procedures for interim compensation and reimbursement of expenses); (ii) be used as a basis to object to the allowance of Professional Expenses; or (iii) authorize DIP Lender to seek disgorgement of any Professional Expenses paid to Professional Persons pursuant to an order of the Court (including, without limitation, any order establishing procedures for interim compensation and reimbursement of expenses) solely based upon the existence of any lien, secured status, superpriority administrative status whether under Sections 364(c)(1) or 507(b) of the Bankruptcy Code, administrative status or any asserted priority in entitlement, including, without limitation, any Lenders' Liens and Claims or any Noteholders' Liens and Claims.

10. **Carve-Out.**

a. For the purposes of this Order, the "*Carve-Out*" shall mean the sum of (1) accrued but unpaid Professional Expenses incurred by Professional Persons at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice; (2) accrued but unpaid Professional Expenses incurred by Professional Persons at any time after the first business day following delivery by DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by this Order, procedural order, or otherwise, but only to the extent all such Professional Expenses set forth in this clause (2) do not exceed an

aggregate amount of $1,000,000; (3) United States Trustee fees, pursuant to 28 U.S.C. § 1930 (the "*U.S. Trustee Fees*"); and (4) all reasonable fees and expenses incurred by a Chapter 7 trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $50,000; provided, that nothing herein shall be construed to impair the ability of any interested party to object to any Professional Expenses sought by any Professional Person. The Carve-Out shall be senior to the Lenders' Liens and Claims, provided that the portion of the Carve-Out described in clause (1) above in the definition of "Carve-Out" that is to be senior to the Lenders' Liens and Claims shall be capped at the lesser of (A) the actual aggregate amount of accrued but unpaid Professional Expenses incurred at any time before or on the first business day following delivery by DIP Lender of a Carve-Out Trigger Notice and (B) the maximum amount set forth in the "Carve-Out (Pre-Trigger Availability Block)" line item shown on the Budget that was last approved by DIP Lender on or before delivery of the Carve-Out Trigger Notice, but in no event shall such maximum amount exceed $2,280,000 (such capped amount being referred to as the "*Capped Trigger Amount*"). The Carve-Out as described in clause (1) above shall be senior to the Noteholders' Liens and Claims only to the extent of the amount, if any, by which the aggregate of all Professional Expenses included in clause (1) of this paragraph exceeds the Capped Trigger Amount and shall be funded by the cash proceeds of Noteholder Collateral that is not DIP Collateral. For purposes hereof, "*Carve-Out Trigger Notice*" shall mean a written notice (i) that is delivered by DIP Lender to Borrowing Debtors and their lead counsel in these chapter 11 cases, the United States Trustee, the Indenture Trustee (or any counsel for the Indenture Trustee that enters an appearance in these chapter 11 cases), lead counsel in these chapter 11 cases for the ad hoc group of certain Pre-Petition Note Holders, and lead counsel to

each Committee (if more than one), and (ii) that informs them that the Commitment (as defined in the DIP Loan Agreement) is or has terminated.

b.　　For the avoidance of doubt, and consistent, and in accordance, with paragraph 10(a) of this Order, the Carve-Out shall be senior to the Lenders' Liens and Claims and the Noteholders' Liens and Claims, provided that the portion of the Carve-Out consisting of Professional Expenses that is calculated with reference to clause (1) above in the definition of "Carve-Out" shall not be senior to the Lenders' Liens and Claims to the extent that such Professional Expenses exceed in aggregate the Capped Trigger Amount; and provided further that the portion of the Carve-Out consisting of Professional Expenses that is calculated pursuant to clause (1) above in the definition of "Carve-Out" shall not be senior to the Noteholders' Liens and Claims unless and to the extent such Professional Expenses exceed in aggregate the Capped Trigger Amount.  The portion of the Carve-Out that is senior to the Noteholders' Liens and Claims (which includes only the portion of Professional Expenses in clause (1) of the definition of "Carve-Out" that exceeds in aggregate the Capped Trigger Amount) shall be satisfied from the Noteholder Collateral (exclusive of any portion thereof consisting of DIP Collateral) or the proceeds thereof.

c.　　DIP Lender may at any time or times in its discretion, upon notice to lead counsel for Borrowing Debtors, lead counsel for each Committee (if more than one) and the U.S. Trustee, fund one or more DIP Loans into an escrow account for the sole benefit of Professional Persons, the U.S. Trustee and any chapter 7 trustee (the "*Carve-Out Escrow Account*") up to an aggregate amount equal to the Carve-Out, but not to exceed the Capped Trigger Amount in the case of Professional Expenses included in clause (1) above in the definition of "Carve-Out."  In making any such DIP Loans, DIP Lender may estimate the amount of U.S. Trustee Fees (both

those that have accrued and are unpaid and those estimated to accrue); provided, however, that regardless of any estimation of U.S. Trustee Fees or otherwise, the full amount of unpaid U.S. Trustee Fees and all reasonable fees and expenses incurred by any Chapter 7 trustee, not to exceed $50,000 in the aggregate, shall be accounted for as part of the Carve-Out. If so requested by any Borrowing Debtor in writing after the delivery of a Carve-Out Trigger Notice, DIP Lender shall fund DIP Loans to the Carve-Out Escrow Account in an aggregate amount necessary to satisfy the payment of Professional Expenses included in clause (1) of the definition of "Carve-Out," but not to exceed the Capped Trigger Amount. All DIP Loans made pursuant to this subparagraph (c), whether made by DIP Lender in its discretion or pursuant to the request of a Borrowing Debtor, together with any Cash Collateral, if any, used for the Carve-Out, may be made or used without DIP Lender's being deemed to waive any Event of Default and regardless of whether the Commitment Termination Date (as defined in the DIP Loan Agreement) has occurred; shall be entitled to all of the benefits and security of the DIP Loan Documents and this Order; and shall reduce the amount of the portion of the Carve-Out that is senior to the Lenders' Liens and Claims on a dollar-for-dollar basis. Both the Carve-Out Escrow Account and all balances therein shall be excluded from property of each Debtor's estate; shall be held to pay fees and expenses covered by the portion of the Carve-Out that is senior to the Lenders' Liens and Claims; and shall be applied first to satisfy allowed Professional Expenses included in clause (1) above in the definition of "Carve-Out" up to the Capped Trigger Amount, with any balance first used to satisfy any remaining portion of the Carve-Out as described in clauses (2), (3) and (4) of the definition of "Carve-Out" and with any surplus returned to DIP Lender for application to pay or cash collateralize any DIP Obligations (whether or not then due or payable), and, if no DIP Obligations are then outstanding, to satisfy any unpaid balance of the Carve-Out.

-28-

d.     Notwithstanding the Full Payment of the DIP Obligations, in no event shall Borrowing Debtors be authorized to use any proceeds of DIP Loans or Cash Collateral to pay any claim of any creditor or other interested party (other than the Pre-Petition Revolver Debt) until all Professional Expenses and other administrative claims have been paid in full to the extent provided by this or any subsequent order of the Court.

e.     In no event shall the funding of DIP Loans or the use of Cash Collateral to satisfy the Carve-Out result in any reduction in the amount of the DIP Obligations or adversely affect DIP Lender's entitlement to Full Payment thereof.

11.     **Preservation of Rights Granted Under this Order.**

a.     Protection From Subsequent Financing Order.  There shall not be entered in these Chapter 11 cases or in any successor cases any order that authorizes the obtaining of credit or the incurrence of indebtedness by any Borrowing Debtor (or any trustee or examiner) that (i) is secured by a security, mortgage, collateral interest or lien on all or any part of the DIP Collateral that is equal or senior to the DIP Liens except as expressly authorized by the DIP Loan Agreement, or (ii) has priority administrative status that is equal or senior to the Superpriority Claim granted to DIP Lender herein with respect to the DIP Collateral; provided, however, that nothing herein shall prevent the entry of an order that specifically provides that, as a condition to the granting of the benefits of clauses (i) or (ii) above, all of the DIP Obligations and Pre-Petition Revolver Debt must be indefeasibly paid in full, in cash, from the proceeds of such credit or indebtedness and all contingent obligations owed to DIP Lender or any Pre-Petition Credit Party fully cash collateralized as provided in the DIP Loan Documents or Pre-Petition Loan Documents (as applicable).

K&E 18186495

b.    <u>Rights Upon Dismissal, Conversion or Consolidation</u>.  If any Chapter 11 case is dismissed, converted or substantively consolidated with another case, then neither the entry of this Order nor the dismissal, conversion or substantive consolidation of such Chapter 11 case shall affect the rights or remedies of DIP Lender under the DIP Loan Documents or the rights or remedies of Pre-Petition Credit Parties or DIP Lender under the Orders, and all of the respective rights and remedies hereunder and thereunder of Pre-Petition Credit Parties and DIP Lender shall remain in full force and effect as if such Chapter 11 case had not been dismissed, converted, or substantively consolidated. It shall constitute an Event of Default if any Borrowing Debtor seeks, or if there is entered, any order dismissing any of the Chapter 11 cases. If an order dismissing any of the Chapter 11 cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Liens, Pre-Petition Revolver Replacement Liens and Superpriority Claim granted to and conferred upon DIP Lender and Pre-Petition Credit Parties shall continue in full force and effect and shall maintain their priorities as provided in this Order (and that such liens and Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Pre-Petition Revolver Replacement Liens and Superpriority Claim.

c.    <u>Survival of Order</u>. The provisions of this Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or converting any of the Chapter 11 cases from Chapter 11 to Chapter 7.

d.    <u>No Discharge; Credit Bid Rights</u>. Unless and until Full Payment of the DIP Obligations shall occur, the DIP Obligations shall not be discharged by the entry of any

order confirming a plan of reorganization in any of the Chapter 11 cases and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, Borrowing Debtors have waived such discharge. No plan of reorganization or liquidation, nor any order entered in connection with a sale of assets under Section 363 of the Bankruptcy Code or otherwise, shall limit or otherwise restrict the right of DIP Lender to submit a credit bid for all or any part of the DIP Collateral.

e.      No Marshalling. In no event shall DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral at any time securing any of the DIP Obligations; and in no event shall any DIP Liens be subject to any pre-petition or post-petition lien or security interest that is avoided and preserved for the benefit of any Borrowing Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

f.      No Requirement to File Proof of Claim.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any bar order establishing a deadline for the filing of proofs of claims entitled to administrative expense treatment under Section 503(b) of the Bankruptcy Code, DIP Lender shall not be required to file any proof of claim with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Agreement and the other DIP Loan Documents without the necessity of filing any such proof of claim; and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the DIP Loan Documents or prejudice or otherwise adversely affect DIP Lender's rights, remedies, powers or privileges under the DIP Loan Documents or this Order.

12.   **Automatic Perfection of Liens.** The DIP Liens, Pre-Petition Revolver Replacement Liens, the replacement liens provided to the Equipment Lien Creditors hereunder and Pre-Petition Noteholder Replacement Liens (collectively, the "*DIP Order Liens*") shall be

K&E 18186495

deemed valid, binding, enforceable and perfected with respect to all of the DIP Collateral, Pre-

Petition Noteholder Collateral, and Equipment Collateral, as applicable, upon entry of this Order.

DIP Lender, Pre-Petition Agent, Indenture Trustee and Equipment Lien Creditors shall not be

required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds,

notices of lien or any similar document or take any other action (including, without limitation,

possession of any of the DIP Collateral or any other property of a Borrowing Debtor) in order to

validate the perfection of any DIP Order Liens.  If DIP Lender, Pre-Petition Agent, Indenture

Trustee or any Equipment Lien Creditor, in its discretion, chooses to file or record any such

mortgages, deeds of trust, security deeds, notices of lien or UCC-1 financing statements, or take

any other action to validate the perfection of any DIP Order Liens, Borrowing Debtors and their

respective officers are directed to execute any documents or instruments as DIP Lender, Pre-

Petition Agent, Indenture Trustee or any Equipment Lien Creditor, as applicable, shall

reasonably request, and all such documents and instruments shall be deemed to have been filed

or recorded at the time and on the date of entry of this Order, and Borrowing Debtors shall pay or

reimburse DIP Lender, Pre-Petition Agent, Indenture Trustee or Equipment Lien Creditors (as

applicable) for the payment of any cost, fees or expenses (including, without limitation,

recording taxes) payable in connection with the filing or recordation of any UCC-1 financing

statements, mortgages, deeds of trust, security deeds, notices of lien or other instruments or

agreements.  DIP Lender, Pre-Petition Agent, Indenture Trustee or any Equipment Lien Creditor

may, in its discretion, file a certified copy of this Order in any filing office in any jurisdiction in

which any Borrowing Debtor is organized or has or maintains any DIP Collateral, Pre-Petition

Noteholder Collateral or Equipment Collateral, as applicable, or an office, and each filing office

is directed to accept such certified copy of this Order for filing and recording.

-32-

13. **Reimbursement of Expenses.** All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of the Orders and the DIP Loan Documents (or any amendments thereto), the preservation, perfection, protection and enforcement of DIP Lender's rights hereunder or under the DIP Loan Documents, the collection of the DIP Obligations, or the monitoring of these Chapter 11 cases, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, whether any of the foregoing were incurred prior to or after the Petition Date, shall form a part of the DIP Obligations and shall be paid by Borrowing Debtors (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Loan Documents and with notice to the U.S. Trustee and any Committee. In no event shall any statement submitted by DIP Lender to Borrowing Debtors, any committee or any other interested person (or any of their respective professionals), with respect to fees or expenses incurred by DIP Lender to any professional retained by DIP Lender operate to waive the attorney/client privilege, the work-product doctrine, or any other evidentiary privilege or protection recognized under applicable law.

14. **Amendments to DIP Loan Documents.** Borrowing Debtors and DIP Lender are hereby authorized to execute, deliver and implement, in accordance with the terms of the DIP Loan Documents and without further order of the Court, any amendments to and modifications of any of the DIP Loan Documents on the following conditions: (i) the amendment or modification must not constitute a material change to the terms of the DIP Loan Documents, (ii) copies of the amendment or modification must be served upon counsel for each Committee (and, prior to the appointment of a Committee, upon the holders of the fifty (50) largest general

-33-

unsecured claims against Borrowing Debtors), the U.S. Trustee, the Indenture Trustee, the ad hoc group of certain Pre-Petition Note Holders, and other interested parties specifically requesting such notice, and (iii) notice of the amendment is filed with the Court. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court. For purposes hereof, a "material change" shall mean a change that operates to shorten the DIP Facility, increase the aggregate amount of the commitment for DIP Loans or Letters of Credit under the DIP Facility, increase the rate of interest other than as provided in or contemplated by the DIP Loan Documents, add specific events of default, or enlarge the nature and extent of default remedies available to DIP Lender following an Event of Default under (and as defined in) the DIP Loan Agreement.

15. **Events of Default; Remedies**.

a. <u>Events of Default and Remedies</u>. An Event of Default shall be deemed to have occurred and exist for purposes of this Order upon the occurrence of an "Event of Default" under (and as defined in) the DIP Loan Agreement.

b. <u>Enforcement of Remedies</u>. Upon or after the occurrence of any Event of Default, DIP Lender shall be fully authorized, in its sole discretion, to exercise all remedies available to it under the DIP Loan Documents and applicable law, including, without limitation, the right to terminate further Credit Extensions under the DIP Facility; accelerate the maturity and demand payment of all of the DIP Obligations; hold and apply to the payment of any of the DIP Obligations any balances in any deposit accounts of each Borrowing Debtor (except those accounts that are subject to the Noteholders Collateral); cause to be cash collateralized (to the extent not previously cash collateralized), whether from Cash Collateral or DIP Loans (which may be funded irrespective of termination of the DIP Facility or the Commitment thereunder),

K&E 18186495

any contingent obligations of Borrowing Debtors to DIP Lender, including those under any Letters of Credit; and upon at least five (5) business days prior written notice to counsel for Borrowing Debtors, counsel for each Committee (or, prior to the appointment of a Committee, to the holders of the twenty (20) largest general unsecured claims against Borrowing Debtors), counsel for the Indenture Trustee, counsel for the ad hoc group of certain Pre-Petition Note Holders and the U.S. Trustee (during which five-day notice period Borrowing Debtors will be entitled to seek an emergency hearing with the Court regarding such enforcement), enforce and foreclose upon the DIP Liens with respect to any or all of the DIP Collateral and take all other actions and exercise all other remedies under the DIP Loan Documents and applicable law that may be necessary or deemed appropriate by DIP Lender to collect any of the DIP Obligations and otherwise enforce this Order and any DIP Loan Documents as if these Chapter 11 cases or any superseding Chapter 7 case were not pending; provided, however, that, such actions or exercise of remedies by DIP Lender shall be with respect to the DIP Collateral only and DIP Lender shall not be authorized to take any such actions or exercise any such remedies with respect to the Pre-Petition Noteholder Collateral.

c.     Enforcement of Remedies in the Court.  In addition to the remedies set forth herein and in the DIP Loan Documents, upon the occurrence and during the continuation of an Event of Default, during any period that Full Payment of the DIP Obligations has not occurred and to provide for an orderly disposition of the DIP Collateral, Borrowing Debtors shall, if so requested in writing by DIP Lender (with a copy of such request concurrently delivered to counsel for each Committee), file (i) one or more motions seeking to sell, assume and assign, or otherwise dispose of any or all of the DIP Collateral as DIP Lender may direct (and as the Court may approve) pursuant to Sections 363 and 365 of the Bankruptcy Code and (if

necessary or appropriate) motions to establish reasonable and customary bid procedures, and (ii) any further motions necessary to maximize the value received from the sale or disposition of the DIP Collateral, including, without limitation, motions to retain any additional professionals to assist Borrowing Debtors in the sale of the DIP Collateral. Borrowing Debtors shall file any such motions promptly (and in any event within twenty-five (25) days) after DIP Lender's request therefor and shall diligently prosecute all such motions for so long as Full Payment of the DIP Obligations has not occurred. In the event of any sale or disposition of the DIP Collateral in accordance with this paragraph or otherwise, DIP Lender shall have the right to credit bid any or all of the DIP Obligations under Section 363(k) of the Bankruptcy Code.

d.      Rights of Pre-Petition Noteholders to Exercise Remedies. Upon the occurrence and during the continuation of an Event of Default, the Indenture Trustee or the Pre-Petition Noteholders shall, with respect to the Pre-Petition Noteholder Collateral be entitled to take the very same actions and exercise all remedies listed and set forth in subparagraphs (b) and (c) of paragraph 15 of this Order in accordance with the Pre-Petition Indenture and all related documents.

e.      Application of DIP Collateral Proceeds. Notwithstanding any contrary provision contained in this Order, if DIP Lender or Pre-Petition Credit Parties shall proceed to enforce the DIP Liens, Pre-Petition Revolver Liens, or Pre-Petition Revolver Replacement Liens in respect of any DIP Collateral, then DIP Lender may, in its discretion, elect to apply all proceeds of the DIP Collateral to the payment or cash collateralization of the DIP Obligations or the Pre-Petition Revolver Debt, in such order of application as DIP Lender may elect in its discretion, and any application to the Pre-Petition Revolver Debt shall not be deemed to reduce the amount of the DIP Obligations.

K&E 18186495

f. _Rights Cumulative_.  The rights, remedies, powers and privileges conferred upon DIP Lender pursuant to this Order shall be in addition to and cumulative with those contained in the DIP Loan Documents.

16. **Monitoring and Inspection of DIP Collateral**.

a. _Inspection Rights_.  Representatives of DIP Lender, Pre-Petition Credit Parties and the Indenture Trustee shall be authorized to visit the business premises of Borrowing Debtors and their subsidiaries in accordance with the terms of the DIP Loan Agreement, the Pre-Petition Loan Documents or Pre-Petition Indenture to (i) inspect any DIP Collateral or Pre-Petition Noteholder Collateral, as applicable, or other assets, (ii) inspect and make copies of any books and records of Borrowing Debtors, and (iii) verify or to obtain supporting details concerning the financial information to be provided to Pre-Petition Credit Parties, DIP Lender or the Indenture Trustee hereunder or under any of the DIP Loan Documents, Pre-Petition Loan Documents or Pre-Petition Note Documents, all as permitted by such documents.

b. _DIP Lender's Right to Retain Professional Persons_.  DIP Lender shall be authorized to retain attorneys, appraisers, consultants, auditors and financial advisors, at Borrowing Debtors' expense, which attorneys, appraisers, consultants, auditors and advisors shall be afforded reasonable access to the DIP Collateral and Borrowing Debtors' business premises, during normal business hours, for purposes of monitoring the business of Borrowing Debtors, verifying Borrowing Debtors' compliance with the terms of the DIP Loan Documents and this Order, and appraising all or any part of the DIP Collateral.

17. **Modification of Automatic Stay.**  The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Order and the DIP Loan Documents, thereby permitting (a) DIP Lender, _inter alia_, to

K&E 18186495

receive collections of DIP Collateral for application to the DIP Obligations as provided herein; (b) DIP Lender or Indenture Trustee to file or record any UCC-1 financing statements, mortgages, deeds of trust, security deeds and other instruments and documents evidencing or validating the perfection of the DIP Liens; (c) DIP Lender or Indenture Trustee to enforce the DIP Liens as and to the extent authorized by this Order; and (d) upon the occurrence and continuation of an Event of Default, Indenture Trustee or Pre-Petition Note Holders to take any actions to enforce the Prepetition Noteholder Liens in accordance with the Pre-Petition Indenture and all related documents.

18.     **Deadline for Challenge to Pre-Petition Revolver Liens and Pre-Petition Revolver Debt.**     Each Borrowing Debtor has voluntarily made the stipulations contained in paragraph H hereinabove (the "*Borrowing Debtors' Stipulations*").   In consideration of (i) DIP Lender's agreement to continue to provide Credit Extensions pursuant to the DIP Loan Documents and to consent to the use of Cash Collateral, and (ii) the consent of the Pre-Petition Note Holder to use of their cash collateral and other Noteholder Collateral, each Borrowing Debtor has waived and shall be barred (a) from challenging the amount, validity, extent, perfection or priority of or seeking to set aside, avoid, offset, subordinate or recharacterize any: of (x) the Pre-Petition Revolver Debt of a Borrowing Debtor or any Pre-Petition Revolver Liens in any Pre-Petition Revolver Collateral of a Borrowing Debtor or (y) the Pre-Petition Note Debt of a Borrowing Debtor or any Pre-Petition Noteholder Liens in any Pre-Petition Noteholder Collateral of a Borrowing Debtor; and (b) from asserting against any Pre-Petition Credit Party, Indenture Trustee or Pre-Petition Note Holder a claim under any contract or tort (including, without limitation, lender liability) theories of recovery or pursuant to Section 105 or Chapter 5 (including, without limitation, Sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code.

K&E 18186495

The Borrowing Debtors' Stipulations shall be binding on Borrowing Debtors, but shall be subject to the right of any party in interest, including, without limitation, a Committee, to the extent that such party has or is otherwise granted standing to do so, to commence an appropriate adversary proceeding or contested matter (a "*Challenge*") objecting to the validity, amount or allowance of the Pre-Petition Revolver Debt or the Pre-Petition Note Debt or the extent, validity, perfection or non-avoidability of the Pre-Petition Revolver Liens in the Pre-Petition Revolver Collateral or the Pre-Petition Noteholder Liens in the Pre-Petition Noteholder Collateral or seeking disgorgement of or offset against all or part of the payment of the Pre-Petition Revolver Debt or Pre-Petition Note Debt by a Borrowing Debtor, which adversary proceeding or contested matter must be filed no later than the earlier to occur of (i) 60 days from the date of the Final Hearing, and (ii) the date of confirmation of Debtors' chapter 11 plan (unless such periods are extended by Court order for cause shown, prior to expiration of any such period).  If a party in interest has not obtained an order from the Court granting it standing to pursue any such Challenge, then such party in interest shall be required promptly to seek such an order as a condition to its further prosecution of such Challenge, subject to any objection by Borrowing Debtors, Pre-Petition Credit Parties, the Indenture Trustee, Pre-Petition Note Holder or any other interested party (provided that the Court may grant standing to a party in interest, including, without limitation, a Committee, over the objection of Borrowing Debtors or any other interested party if it determines such objection to be without merit), and such party in interest's authority to prosecute such Challenge shall be contingent upon its obtaining such an order. In no event shall the filing of any such Challenge affect any of the rights, privileges, powers or remedies of Pre-Petition Credit Parties, the Indenture Trustee, or Pre-Petition Note Holders under the Orders, the Pre-Petition Loan Documents or the Pre-Petition Note Documents pending a ruling on such

K&E 18186495

Challenge or affect any of the right, privileges, powers or remedies of DIP Lender under the DIP Loan Documents or the Orders. If such Challenge is not timely filed or if standing to a party in interest in connection with any such Challenge is not granted, (i) with respect to the Pre-Petition Revolver Debt and Pre-Petition Note Debt of a Borrowing Debtor, all of the Pre-Petition Revolver Debt and Pre-Petition Note Debt shall be deemed a legal, valid, binding and enforceable claim that is allowed in full as a secured claim and not subject to subordination or recharacterization in these cases, in any superseding Chapter 7 cases or in any other proceedings; (ii) with respect to the Pre-Petition Revolver Liens granted by a Borrowing Debtor as security for the Pre-Petition Revolver Debt and the Pre-Petition Noteholder Liens granted by a Borrowing Debtor as security for the Pre-Petition Note Debt, such prepetition liens shall be deemed to be legal, valid, binding, enforceable, perfected and unavoidable in these cases, in any superseding Chapter 7 cases and in any other proceedings; and (iii) any and all claims and other causes of action (including, without limitation, causes of action or theories of recovery pursuant to Section 105 or Chapter 5 of the Bankruptcy Code) against Pre-Petition Credit Parties, the Indenture Trustee and Pre-Petition Note Holders shall be forever waived and barred.

19. **Service of Order.** Promptly after the entry of this Order, Borrowing Debtors shall mail, by first class mail, a copy of this Order to counsel for DIP Lender, the U.S. Trustee, counsel for each Committee (or, if no Committee has been formed as of the entry of this Order, then the holders of the twenty largest general unsecured claims against Borrowing Debtors), counsel for the Indenture Trustee, counsel to the ad hoc group of Pre-Petition Note Holders, each creditor known by Borrowing Debtors to have or assert a lien upon any DIP Collateral, the Internal Revenue Service, the Equipment Lien Creditors and all parties (if any) who have filed

requests for notices under Rule 2002 of the Bankruptcy Rules, and shall file a certificate of service regarding same with the Clerk of the Court.

20. **No Deemed Control.** By consenting to this Order, making Credit Extensions to Borrowing Debtors and administering the financing relationship with Borrowing Debtors pursuant to the DIP Loan Documents, DIP Lender shall not be deemed to be in control of any Borrowing Debtor or any Borrowing Debtor's operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar state or federal statute) with respect to the operations or management of such Borrowing Debtor.

21. **Binding Effect; Successors and Assigns.** Immediately upon entry of this Order by the Court (notwithstanding any applicable law or rule to the contrary), the provisions of this Order shall be binding upon and inure to the benefit of all parties in interest in these Chapter 11 cases, including, without limitation, DIP Lender, Pre-Petition Credit Parties, the Indenture Trustee, the Pre-Petition Note Holders, the Equipment Lien Creditors and Borrowing Debtors and their respective successors and assigns (including, without limitation, any Chapter 11 trustee hereafter appointed or elected for the estate of any Borrowing Debtor or any Chapter 7 trustee appointed in any superseding Chapter 7 case); provided however that DIP Lender shall have no obligation to make Credit Extensions to, or consent to the use of Cash Collateral by, any Chapter 7 or Chapter 11 trustee appointed or elected for the estate of any Borrowing Debtor.

22. **Order Controls.** Except as specifically amended or otherwise modified or superseded by this Order, all of the provisions of the Interim Financing Order shall remain in effect and are hereby ratified by this Order. In the event of any inconsistency between the terms

K&E 18186495

or provisions of the DIP Loan Documents, the Interim Financing Order and this Order, the provisions of this Order shall govern and control.

23.  **Effect of Appeal.**  Consistent with Section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter modified, vacated or stayed on appeal:

a.  such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or DIP Liens granted or incurred by Borrowing Debtors to DIP Lender prior to the effective date of such stay, modification or vacation, or the validity, enforceability or priority of any DIP Liens, priority or right authorized or created under the original provisions of this Order or pursuant to the DIP Loan Documents; and

b.  any indebtedness, obligation or liability incurred by Borrowing Debtors to DIP Lender under the DIP Loan Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and DIP Lender shall be entitled to all the rights, remedies, privileges and benefits, including, without limitation, the DIP Liens and priorities granted herein and pursuant to the DIP Loan Documents, with respect to any such indebtedness, obligation or liability. All Credit Extensions under the DIP Loan Documents are made in reliance upon this Order, and, therefore, the indebtedness resulting from such Credit Extensions prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose the priority of the DIP Liens or Superpriority Claim status, or (iii) be deprived of the benefit of the status of the DIP Liens and Superpriority Claim granted to DIP Lender under this Order or the DIP Loan Documents, as a result of any subsequent order in any one of these Chapter 11 cases, or any superseding cases, of Borrowing Debtors.

K&E 18186495

24.     **Effectiveness.**  This Order shall take effect and be enforceable immediately upon entry hereof notwithstanding any contrary Bankruptcy Rule or Rule of Civil Procedure and there shall be no stay of execution or effectiveness of this Order.

25.     **Retention of Jurisdiction.**  The Court has and will retain jurisdiction to enforce this Order according to its terms.

New York, New York
Date:  January 4, 2011

**s/Arthur J. Gonzalez**
Honorable Arthur J. Gonzalez
Chief United States Bankruptcy Judge

K&E 18186495

APPROVED FOR ENTRY:

**KIRKLAND & ELLIS LLP**
Ryan Bennett, Esq.
Paul Wierbicki, Esq.
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
ryan.bennett@kirkland.com
paul.wierbicki@kirkland.com

Counsel for Debtors

**HAHN & HESSEN**
Joshua I. Divack, Esq.
488 Madison Avenue
New York, New York 10022

**PARKER, HUDSON, RAINER & DOBBS LLP**
C. Edward Dobbs
Douglas A. Nail
1500 Marquis Two Tower
285 Peachtree Center Avenue, NE
Atlanta, Georgia 30303
Telephone:  (404) 523-5300
Facsimile:  (404) 522-8409
edobbs@phrd.com
dnail@phrd.com

Co-Counsel for Pre-Petition Credit Parties and DIP Lender

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Chris L. Dickerson
155 North Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 407-0700
Facsimile:  (312) 407-8680
chris.dickerson@skadden.com

Counsel for the ad hoc group of certain Pre-Petition Note Holders